[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a case of a twentieth-century American family caught in the ancient web of the law of property. The plaintiffs here seek a sale, pursuant to Conn. Gen. Stat. 52-500, of real property they own in common with the defendant. The property, a small ranch house in which the defendant has resided for sixteen years, cannot sensibly be partitioned. Because the right of sale under such circumstances enters into the very nature of property held in common, a sale must be ordered.
The facts of this case involve the life and family of the late Rudolph A. Frank, Sr. ("Rudolph Sr.") Rudolph Sr. was born in 1927. His first marriage was to a woman named LaVerne, by whom he had four children: Rudolph Jr., Denise, Diane, and Dorian. These four children, who are now in their thirties, are the plaintiffs in this case.
In 1971 or 1972, Rudolph Sr. divorced LaVerne. Following his divorce he lived with a woman named Greta, who he had known for a few years. Greta was, at the time, married to another man, but she eventually divorced him. On December 3, 1975, she married Rudolph Sr. and became Greta Frank. She is the principal defendant in this action. (The Federal Deposit Insurance Corporation, which holds the mortgage on the premises in question, is the other defendant.)
When Rudolph Sr. and Greta were first married, they lived in an apartment in New Haven. On July 29, 1976, they bought the house that is the subject of this controversy. The house was purchased for $35,500 (Ex. A) and was subject to a mortgage in the original amount of $31,900 (Ex. D). The house is located at 193 South New Road in Hamden. An appraisal in evidence (Ex. C) indicates that it is a modest but well-maintained single family ranch house on a 100 x 130 foot lot (twenty nine-one hundredth of an acre). The house consists of six rooms with 1,032 square feet of gross living area. On February 27, 1992, it had a fair market value of $137,000. It CT Page 3685 is in a residential neighborhood (zoned as such) of similar homes and is now being put to its highest and best use. As a practical (and, given zoning requirements, a legal) matter, neither the building nor the lot can be subdivided or otherwise partitioned.
The warranty deed by which Rudolph Sr. and Greta acquired 193 South New Road conveys the property to "RUDOLPH FRANK and GRETA FRANK, and unto the survivor of them, and unto such survivors (sic) heirs and assigns forever." (Ex. A.) The deed was signed on July 29, 1976, and filed with the town clerk of Hamden on August 3, 1976.
The Frank family at this time was not a particularly happy one. The evidence is abundantly clear that Greta and Rudolph Sr.'s children never got along. They intensely dislike each other now, and it is a fair inference from the evidence that their relationship has never at any time warmed to the level of cold formality. Rudolph Sr. and Greta fought as well. There is no point now in sorting out the question of fault, but it is apparent that Rudolph Sr. had some medical problems, and possibly an alcohol problem as well, and that he and Greta occasionally fought so violently that the authorities would be called. At some point in the summer of 1977, Greta left the home.
At about the time of this separation, Rudolph Sr. decided to convey his share of the house to his children. He told Diane (and, in a less detailed way, Dorian) that he was having problems with his marriage and that he wanted to protect his children. In something of the fashion of Odysseus ordering his crew to bind him to the mast and ignore his plans for release when he heard the Sirens' song, Rudolph Sr. told Diane and Dorian that they were not to question his decision and under no circumstances were they to ever give him the house back no matter how much he asked for it. On August 26, 1977, Rudolph Sr. signed a quitclaim deed (Ex. B) conveying all of his right, title, and interest in the property to his four children. The deed was filed with the town clerk on August 29, 1977.
In the early fall of 1977, Greta returned to Rudolph Sr. When he told her what he had done, she asked him to get the property back. In 1978, an attorney retained by Rudolph Sr. wrote to his children asking for a reconveyance of the property, but — heeding his earlier command — they declined to do so.
Greta and Rudolph Sr. lived together at 193 South New Road until May 1987, when his health deteriorated to the point where he had to be placed in a convalescent home. He died on August 24, 1987. Greta still lives in the home. She continues to pay the mortgage (a second mortgage has been fully paid) and has maintained the house without contribution from the plaintiffs. The plaintiffs CT Page 3686 do not visit the house (where they are not welcome in any event), have never contributed to its upkeep, and do not desire its use or occupancy. Not to put too fine a point on it, they want the money, and if they hurt Greta in the process, they will shed very few tears. This action for sale commenced by service of process on December 19, 1989.
The first question that must be addressed is the nature of the plaintiffs' interest. Although the law has been settled to the contrary since the time of Littleton, Greta seriously (or apparently seriously) maintains that the plaintiffs have no recognizable property interest to assert. According to Greta's special defenses and counterclaim, Rudolph Sr., as a joint tenant with right of survivorship, who happened not to survive, could only convey a life estate in his property, and once he died, that life estate was gone. The short response to this contention is that this is not, and has never been, the law. A joint tenancy "can exist only so long as there is a unity of (1) interest, (2) title, (3) time and (4) possession." New Haven Trolley Bus Employees Credit Union v. Hill, 145 Conn. 332, 335, 142 A.2d 730 (1958). When any of these unities are broken, the joint tenancy is destroyed. Id. A unilateral act of conveyance breaks the unity of title. "[A] joint tenant of realty has a present right to transform into a different present and vested interest the possibility, the gamble — uniquely characteristic of a joint tenancy — that, depending on whether or not he is the survivor of the joint tenants, he will end up owning all, or none, of the property." Maine Savings Bank v. Bridges, 431 A.2d 633, 635 (Me. 1981). Rudolph Sr.'s conveyance of his interest to his children "sever[ed] the joint tenancy as to the interest or interests so conveyed and the . . . grantees . . . hold the interest or interests as . . . tenants in common with the remaining joint tenant." Conn. Gen. Stat. 47-14c. The plaintiffs are thus tenants in common with Greta.
Greta next argues, in her posthearing brief, that even if the plaintiffs are tenants in common, they lack standing to bring this action because they were not "in possession, or seized, of the land when the writ was brought." Adam v. Ames Iron Co., 24 Conn. 230,233 (1955). See Harrison v. International Silver Co., 78 Conn. 417,432, 62 A. 342 (1905). Greta has at no time pleaded this defense, and it was not, consequently, addressed at the hearing. Under these circumstances, it is questionable whether this defense ought to be addressed at all. Suffice it to say that, "An owner of real estate need not have actual possession in order to maintain an action for partition or sale. Conn. Gen. Stat. 52-495 and 52-500. An owner need only have the right to possession to maintain such an action. Penfield v. Jarvis, 175 Conn. 463, 467,399 A.2d 1280 (1978)." Harrington v. Harrington, 20 Conn. App. 492, 494,568 A.2d 468, cert. denied, 214 Conn. 802, 573 A.2d 315 (1990). (Emphasis added.) "[P]roof of an ouster by one cotenant of another CT Page 3687 ought to be of the most satisfactory nature. Ordinarily possession of one tenant in common is possession of all." Struzinski v. Struzinsky, 133 Conn. 424, 428, 52 A.2d 2 (1947) Adam and Harrison involved plaintiffs who had clearly been ousted from the properties they claimed for many years. In fact, the ousters in those cases appear to have been for more than fifteen years, and the plaintiffs were effectively barred by the statute of limitations. See Conn. Gen. Stat. 52-575. Nothing remotely comparable has occurred in this case. The plaintiffs here have ample standing to assert their claim.
The Court now turns to the merits of the complaint. Conn. Gen. Stat. 52-500 (a) provides that, "Any court of equitable jurisdiction may, upon the complaint of any person interested, order the sale of any property, real or personal, owned by two or more persons, when, in the opinion of the court, a sale will better promote the interests of the owners." The phrase "better promote the interests of the owners" is somewhat inartful, for the statutory text does not address the question "better than what?" Our Supreme Court has, however, long held that the phrase "better promote the interests of the owners" means "better promote it than a partition." Ford v. Kirk, 41 Conn. 9, 12 (1874). "Upon this point, a page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921).
"Partition procedure originated very early in the evolution of English law. Originally this procedure was available only to coparceners, that is, to persons who had become concurrent owners as a result of a descent, and who, consequently, had not voluntarily participated in the creation of the concurrent ownership. " 2 Restatement of Property 654 (1936). By the time of Henry VIII, the limited availability of partition was causing serious problems. The old feudal estates were being broken up (particularly after the dissolution of the monasteries), and their new owners, who viewed real property as a form of investment, had a strong desire to convert their property interests into money. "The inconvenience resulting to tenants in common and to joint-tenants from their inability to compel partitions was, in many instances, of the most grievous character." A. Freeman, Cotenancy and Partition 542 (2d ed. 1886). "Fractional shares in estates would for all practical purposes remain unmarketable if no means was provided by which a purchaser could dissolve an uncongenial partnership and protect his interests." William H. Loyd, Partition, 67 U. Pa. L. Rev. 162, 169 (1919). In response to the prevailing unhappiness with this situation and to a number of acts of spoilage that had occurred, the Parliament of 1539 passed the statute For Joint Tenants And Tenants In Common, 31 Hen. 8, ch. 1, providing "all joint tenants and tenants in common" with the same right of partition enjoyed by coparceners at common law. Two centuries later, in 1720, the General Court of Connecticut ordered CT Page 3688 that all "joint tenants, or tenants in common may be compelled by writ of partition to divide the same." Public Records of the Colony of Connecticut (1717-25) 217, 218 (1872). By virtue of these statutes, now centuries old, "this right of partition enters into the very nature of the tribe of estates holden in common, and is inseparable from them." Richardson v. Monson, 23 Conn. 94, 97
(1854).
But partition is an equitable proceeding, as the text of Conn. Gen. Stat. 52-495 expressly provides. (Sale is equitable as well; Conn. Gen. Stat. 52-500.) How can traditional notions of equity, which involve fairness and discretion, be squared with the law of partition, stated in numerous cases like Richardson v. Monson, which treats partition as a matter of right? The answer, again, is historical. The process of partition at common law was one of "extreme difficulty." Agar v. Fairfax, 34 Eng. Rep. 206, 214 (Ch. 1810). The plaintiff in a common law court had to prove not only his title but the title of the defendants, id., and he had to do so without benefit of discovery. 2 Joseph Story, Commentaries on Equity Jurisprudence 605 (1836). Given this difficulty, equity stepped in to fill the void. "[T]he Court of Chancery assumed jurisdiction at a very early period to decree partition in proceedings instituted by bill." 39 Halsbury's Laws of England 366 (4th ed. 1982). This was "not a jurisdiction founded at all in mere convenience; but in the judicial incompetency of the Courts of Common Law to furnish a plain, complete, and adequate remedy for such cases." 2 Joseph Story, supra, at 604. The Chancellor did not, however, treat partition cases as cases in which he had the discretion to deny partition altogether. The only discretion he had was that between granting equitable relief and leaving the parties to their legal remedy. "It is not for the court to say," an eighteenth century Chancellor explained, "one party shall not hold his part of the estate as he pleases: but another person has also the same right to enjoy his part as he pleases, and therefore to have the estate divided. The law has provided, that one shall not defeat the right of the other to the divided estate." Calmady v. Calmady, 30 Eng. Rep. 780, 781 (Ch. 1795).
Partition, then, was a matter of right. But this right proved to involve substantive difficulties as well as procedural ones. In some cases the nature of the property in question made partition either inconvenient or absurd. In Turner v. Morgan, 32 Eng. Rep. 307 (Ch. 1803), Lord Eldon ordered partition of a single house, and in argument, the plaintiff cited the case of a house (belonging, fittingly, to an attorney) which was partitioned by actually building a wall up the middle. Id. at 308. In Scovill v. Kennedy,14 Conn. 349 (1841), the Connecticut Supreme Court faced a case of almost insuperable difficulty, as the plaintiffs in that case sought partition of a stream. "Although a partition here will be attended with considerable trouble and inconvenience to the CT Page 3689 parties," the Court explained, "yet according to rules now well established, we cannot, on that account, say, that the plaintiffs' prayer for a partition shall not be granted." Id. at 361. The stream was ordered to be physically divided, a process that involved "so much expense and difficulty" that a committee appointed by the Superior Court had recommended against it. Id.
Perhaps in response to Scovil, the General Assembly enacted An Act Relating To The Partition of Real Estate, 1844 Conn. Pub. Acts Ch. 13. That act, the direct ancestor of Conn. Gen. Stat. 52-500, provided, "that in all proceedings in partition . . . wherever in the opinion of [the] court the interests of all in the common estate will be best promoted by a sale of such estate and division of the moneys arising from such sale among the parties in interest, such court shall have power to order such sale and make such division." This statute, the Connecticut Supreme Court explained a decade later, "introduces . . . no new principle; it provides only for an emergency, when a division cannot be well made, in any other way." Richardson v. Monson, supra, 23 Conn. at 97.
Against this historical backdrop, the law of partition can be summarized as follows:
 No person can be compelled to remain the owner with another of real estate, not even if he become such by his own act; every owner is entitled to the fullest enjoyment of his property, and that can come only through an ownership free from dictation by others as to the manner in which it may be exercised. Therefore the law afforded to every owner with another relief by way of partition, and this regardless alike of the difficulties attending separation and the consequences to his associate. Rights to the use of running water, rights to dig ores, have been declared to be subject to this law. But inasmuch as it might sometimes happen that by partition the property would be practically sacrificed, the statute has opened a way of escape from such a result. It permits a court of equity to order a sale when in its opinion a sale will better promote the interest of the owners.
 Therefore since its enactment there have been two modes of relief within the power of the court — partition and sale. Every owner with another is entitled to CT Page 3690 separate ownership by one of these; by partition first and always, if that is possible; if it is not, then by sale; every petitioner for a sale assuming the burden of proving partition impossible; and if upon such petition the impossibility of partition is proven, the court is as much bound to order a sale as it would have been to order a partition upon a prayer for it and upon proof that it could be conveniently and equitably made. If upon a petition for a sale it is proven both that partition is impossible and that a sale would result in a diminution of income, the petitioner is not for that reason to be shut up to continued joint ownership; he must have leave to go out of the possible door notwithstanding that diminution, upon such petition the most that can be insisted upon by plaintiff or defendant is that the undeniable right to severalty in ownership shall be secured by the least injurious of the two specified modes.
Johnson v. Olmstead, 49 Conn. 509, 517-18 (1882). The only "discretion" enjoyed by the trial court, where the title of the plaintiff is clear, is in choosing between a partition in kind and a sale. "[I]nvocation of the mantra of `equitable considerations' bestows no license upon a trial court to grant or deny [relief] according to its views of the respective situations of the cotenants." Carter v. Carter, 516 A.2d 917, 920 (D.C. 1986).
For these reasons, the equitable positions of the parties in this case simply cannot be weighed by the court regardless of the fact that this is an equitable proceeding. The title of the plaintiffs being clear, the only choice before the court is that between partition and sale. Partition here, would make not a particle of sense. The plaintiffs' demand for a sale of the premises and a division of the proceeds must be granted.
In the second count of their amended complaint, the plaintiffs seek money damages and equitable relief from Greta for her use and occupancy of the premises in question. Although they do not cite a statutory basis for this claim, it appears that they rely upon Conn. Gen. Stat. 52-404 (b). Use and occupancy payments may be awarded by the court under such circumstances. Lerman v. Levine,14 Conn. App. 402, 541 A.2d 523, cert. denied, 208 Conn. 813,546 A.2d 281 (1988). At the hearing, however, the plaintiffs failed to address this claim in any way. They made no claim for any equitable relief (other than the sale) and presented no evidence CT Page 3691 whatsoever on use and occupancy value. "It is axiomatic that the burden of proving damages is on the party claiming them." Expressway Associates II v. Friendly Ice Cream Corp., 218 Conn. 474,476, 590 A.2d 431 (1991). Given the plaintiffs' failure to meet this burden, the relief sought in the second count must be denied.
No suggestion was made at the trial, and no hearing was held, on the questions of the identity of the committee and the conditions of sale. The court, through the clerk's office, will schedule a hearing on these matters at a convenient time. See Neumann v. Neumann, 14 Conn. Sup. 166, 170 (1946), aff'd,134 Conn. 176, 55 A.2d 916 (1947).
Subject to a posthearing order addressing the questions just described, a decree may be entered directing a sale of the property. The mortgage now held by the Federal Deposit Insurance Corporation shall have the priority described in the stipulation of the parties submitted at trial. The proceeds of the sale shall be paid into court for disposition in accordance with Conn. Gen. Stat.52-502 (b).
Dated at Waterbury, this 21st day of April, 1992.
JON C. BLUE JUDGE OF THE SUPERIOR COURT